13426.   AUSTIN *et al. v.* CITY OF ATLANTA.

LUKE, J. The defendant was convicted of the violation ·of a municipal ordinance. The judge of the superior court did not err in denying and overruling the certiorari.

*Judgment affirmed. Broyles, C. J., and Bloodworth, J., concur.*

DECIDED JUNE 13, 1922. REHEARING DENIED JULY 11, 1922.

Certiorari; from Fulton superior court — Judge Pendleton. December 14, 1921.

Application for certiorari was denied by the Supreme Court.

Thomas H. Austin and the Standard Coal Company were charged with having violated an· ordinance of the City of Atlanta by selling coal without weighing it, and without furnishing on delivery of the coal a written statement of its weight. The defendants contended that the ordinance did not apply in this case, because, by its express terms, it applied only to sales " by weight," and, under the contract between the coal company and the pur-

chaser, this coal was not to be weighed; and that, although the coal was sold as "two tons," at a stated price per ton, the transaction, as shown by the written contract and other evidence, was not a sale by weight, but amounted to a sale by measure, or by two-ton truck or wagon load, under a system by which, for the purpose of saving expense and enabling purchasers to obtain coal at a price lower than the prevailing prices, a carload which had been weighed was divided among purchasers named in a list, in proportions of one or more tons, without reweighing, and the coal was delivered from the car to a truck or wagon of the proper measure, which carried it to the purchaser. In the recorder's court of Atlanta the defendants were adjudged guilty and fined, the recorder holding that "under the ordinance all coal must be weighed, regardless of whether a man signs an order waiving it or not." The case came to the Court of Appeals on exceptions to the overruling of a certiorari in the superior court.

The ordinance in question provides: "It shall be unlawful for any dealer in coal or coke to sell same by weight in the City of Atlanta unless said coal or coke so sold shall have been weighed upon accurate scales of such dealer or of the party from whom he purchased or the official city scales, and certificate of such weight shall be delivered by said dealer to the purchaser, and any such dealer who shall sell any coal or coke in the City of Atlanta without weighing same, or who shall over-certify such weight to an amount of 25 pounds on deliveries of less than 500 pounds, or of 50 pounds on deliveries above 500 pounds, shall upon conviction thereof before the recorder . . be punished by a fine of not less than $10 nor more than $100, or by labor on the streets," etc.; "and should it appear upon the hearing before the recorder that such shortage in weight was intended to cheat or defraud the purchaser, it shall be the duty of the recorder to bind the offender over . . for a violation of the State offense; provided, however, that the terms of this ordinance shall not apply to coal and coke sold in carload lots upon weights at mines, and where the same is not to be reweighed at point of delivery." "All coal dealers and all persons engaged in the hauling and delivering of coal shall, on delivery of a load to a purchaser, furnish said consignee or purchaser a written statement showing the name of the dealer, the name of the person hauling the coal, the weight of the coal, and

the name of the driver." (City Code of Atlanta of 1910, §§ 3003, 1903.)

G. M. Ewing testified: "Recently I bought some coal from the Standard Coal Company. I went to the office last Wednesday and gave an order for two tons at $7.75 per ton. I paid $15.50 for it then and there. This is the receipt, and it states, ' Received the coal without weighing.' This receipt was given and the transaction took place at the office of the Standard Coal Company . . in the city of Atlanta. . . The coal was to be delivered at 25 Larkin street in the city of Atlanta. They sent the coal out Friday afternoon. My wife received it. The coal was to be delivered on a two-ton truck. The young lady that waited on me for the Standard Coal Company told me that the trucks were weighed and measured to hold two tons and it would be a full load, but it was not delivered in a truck, but in a coal company's wagon. . . I reweighed the coal with standard scales. . . I bought 4,000 pounds, two tons, and I only weighed out, when I weighed all the lot, 2,484 pounds, making 1,516 pounds short. Not· a piece of coal had been used. . . The receipt is as follows: ' Aug. 11, 1921. Atlanta, Ga. Received of G. M. Ewing fifteen & 50/100 dollars in payment for two tons Kentucky lump coal about 2 by 6 inches, to be delivered at 25 Larkin street, at convenience of Standard Coal Company, within 30 days from this date, in accordance with the order given them, without reweighing in Atlanta, as per contract. This payment does not include any storage, and if storage is necessary, customers agree to pay the storage charge at time of delivery of coal. [Signed] Standard Coal Co., by C. L. Arnold.' The contract referred to in the receipt is as follows: ' Aug. 11, 1921. Atlanta, Ga. Standard Coal Company, Atlanta, Ga. Deliver to G. M. Ewing, No. 25 Larkin street, . . 2 tons Kentucky lump coal, about 2 by 6, at $7.75 per ton, large size. If storage is necessary I agree to pay for storage [at stated prices] . . This coal to be delivered at any time at convenience of the Standard Coal Company within thirty days from this date. It is understood and agreed that this coal is to be hauled to customer direct from car without reweighing in Atlanta. [Signed] G. M. Ewing.' The dray ticket is as follows: ' Atlanta, Ga. Aug. 12, 1921. G. M. Ewing, 25 ·Larkin street, received from Standard Coal Company (2) 1·load lump as per contract order. Driver M.

31. [Signed] Mrs. Ewing.' These two papers, the receipt and contract, together make the transaction. . . I understood and agreed that the coal was not to be reweighed but was to come out of the carload lot to me direct. . I just bought two tons of the coal to be delivered out of the car. I went to see the company and told the man who sent me the coal that I would give him the privilege of taking it back and he could reweigh it himself, but he has not done so yet; but he stated that he would make it good, that is, Mr. Thomas said so. Mr. Thomas was delivering coal for the Standard Coal Company." A. J. Cloud testified, that he was a measuring inspector, that Mr. Ewing called him up in regard to the shortage in the coal, and that T. H. Austin, manager and proprietor of the Standard Coal Company, said that he did not weigh his coal, but sold it from the car direct to the wagon to be delivered, and that the parties signed an agreement of the kind shown by the papers introduced in evidence.

On the part of the defendants it was testified that their plan of dealing, in accordance with which the contract in question was made, was intended to enable the purchaser to obtain coal at a price lower than it would otherwise cost him. D. H. Thomas testified: "I superintended the delivery of this coal to Mr. Ewing. I was rushed up with the trucks, . . and borrowed four or five wagons and drivers, and they had instructions to load the wagons just as they did at the yards; and the wagon that went to Mr. Ewing's house was a two-ton wagon filled up. . . The wagon was loaded full, a two-ton body, built for two tons. There was that much on the wagon when it left there. I have not been able to get hold of the negro that carried the coal. . . I have been trying to see him to see what became of the coal. . . I would swear there was mighty near two tons when it went out. I could tell there was two tons on the wagon when it went out, without its being weighed. . . Mr. Ewing stated that his wife said when the wagon got to his house it was not more than two thirds full, there was coal in the back and some in the front, but none in the middle. . . I didn't know it until Monday, and then I went over to see Mr. Ewing and told him I was working for the Standard Coal Company and they held me responsible, and I didn't want to send out short coal; 'I will take your word for it as a gentleman and will make it good. I am very sorry.

I have been dealing in coal a long time and have not had a kick. This is the first complaint I have had, and I will certainly make it good.' . . I sent him two tons to be estimated, and that much left the yard for him. He bought it under that contract and I was not to reweigh it. . . I have been handling coal by the carload this way off and on about ten years. I have been dividing these carloads by the railroad weights, and checking it out in these wagons in two tons and one ton. The division of the whole carload usually corresponds with the railroad weight; sometimes in a whole carload it is a ton to a ton and a half difference. We have no coal yard. . . The benefit to the customer by handling coal this way is that he gets a lower rate, gets his coal for less. For instance, this coal delivered on the yard would have cost him $9.50 a ton, and he got it at $7.75. That is very close to the wholesale price. If you send out a ton of coal or two tons of coal and the negro steals 500 pounds, of course you are that much short, Sometimes in a carload lot it runs one half ton over or one half ton short, and when it is short the company stands the shortage; I am speaking of the division of the 45 or 50 ton car. The wagons that I have are absolutely accurate. I can come as close to the weight of the coal as a man can come to the weight of a piece of meat. We do not make a written statement in each case of the weight of the coal, because the coal is not weighed, and we seldom put on the name of the driver, but I put the wagon number on there." A letter from the Standard Coal Company to this witness, which he testified he had received, instructing him to deliver two tons of coal to G. M. Ewing from a certain car containing 45.05 tons, divided among named purchasers in stated numbers of tons, was introduced in evidence.

Defendant T. H. Austin testified: " Some two months ago we took into consideration the fact that retail dealers in Atlanta were making a very large profit on coal, and that we could sell at retail at considerably lower prices if we could cut out all yard expenses that other dealers have and cut out the credits that they give. . . We knew that if we could have a plan by which we could, when we got a carload of coal, deliver it direct from the car to the customer, we could make a great saving to the customer. People come to the office and make a contract with us, and we use the form as already shown. . . No sales are made except to a

customer who comes to the office, and to them is explained fully how the coal is to be handled, that it is to be loaded in trucks or wagons of sufficient capacity, that have been tested and which we know, when full, contain close to that amount of coal. The party buying that way saves from one to two dollars per ton. . . When the customer .thoroughly understands it he signs the contract, which distinctly sets forth those facts. and also the fact that the coal is not to be reweighed on the ground. We then take cars· with that coal on the tracks when it comes to Atlanta in our wholesale business, and when we get orders enough to make a carload of coal we give Mr. Thomas lists. We then write Mr. Thomas a letter like the óne in this case, telling him to deliver so and so so many tons of coal out· of the car, whatever the bill of lading calls for. The customers get the whole weight of what is in the car, and we never give Thomas orders for more than the number of tons. We lose the fractions of a ton, as in this case. If a car contains 45 tons and one hundred or three hundred pounds, it is turned :over and delivered as 45 tons. We have never had a single complaint of any kind whatever except in this case. . . As soon as I heard from Mr. Thomas about this matter I told him to go and see Mr. Ewing and do what was right in the matter. Mr. Cloud stated to me that he had a good many complaints from the local dealers about my delivering coal in that manner. I told Mr. Cloud that I·wanted to be within the law, and if the man did not get the amount of coal, I proposed to right it. The Southern Weighing and Inspection Bureau was established at junction points throughout the mining regions and an agency established and a set of scales put in, and they are frequently tested, and when a trainload is assembled at junction or at mines in those regions, those cars are weighed by the bureau and the railroad weights and sales are based on that. Those are the weights on which all settlements for wholesale coal are made. There is no reason why, where a carload of coal is divided up in a city on the basis of the same rates in one or two ton trucks in the hands of an expert coal man, the purchaser should not get as fair weights of coal as in any other way. If the driver is not reliable, of course the coal that is sold will not be fully delivered. We want to comply with the law, . · and the whole purpose of this· case is to get our method of doing business before the court so as to see whether we are violating the ordinance or not."

*C. L. Pettigrew,* for plaintiff in error, cited: Civil Code (1910), §§ 5358-9, 2165, 6389, 10, 4253, 2500; 88 *Ga.* 735; 9 *Ga. App.* 797; 101 *Ga.* 332; 152 *Ga.* 393 (110 S. E. 178); 203 Ala. 335 (14 L. R. A. 672); 13 Cyc. 423, sec. 335.

*James L. Mayson, Jesse M. Wood,* contra, cited: Civil Code (1910), § 10; 3 McQuillin Mun. Corp., § 970; 9 Cyc. 480; 9 *Ga. App.* 511.